In the matter of RICHARD F. VEEDER, Appellant, and NANCY MARS, Appellant,

*vs.*

JOSHUA J. GUPPY, County Judge, &c., Appellee.

APPEAL FROM THE CIRCUIT COURT OF COLUMBIA COUNTY.

The act of Congress approved August 8th, 1846, entitled "An Act to grant a quantity of land to aid in the improvement of the Fox and Wisconsin Rivers, and to connect the same by a canal, in the Territory of Wisconsin," took effect on the admission of Wisconsin as a State, into the Union.

The act aforesaid vested in the State the title, potentially, to a quantity of land equal to three sections in width, on each side of the Fox river, and determined the location of the lands (except to any deficiency that might happen on account of any of the lands appropriated by the U. S.) to the alternate sections on each side of said river, requiring only the ministerial acts of survey, selection and approval, to render the specific parcels which would fall to the State or the U. S., definite and fixed.

By the grant, the State, on admission into the Union, became seized of one half of the lands, (not already appropriated,) on each side of Fox river, and the mode of partition being established by the grant, it was competent for the State to prescribe the mode and terms for the sale of the lands granted, which mode and terms would apply to the specific lands of the State as soon as partition should be made.

The selection of the lands by the governor, and the approval by the President provided for by the act of Congress, were acts of partition merely, and not of conveyance.

The State being owner of a moiety, viz : the alternate sections of the lands, had a right to prescribe such rules, regulations, and conditions to the disposal of the lands granted, (not inconsistent with the terms of the grant,) as it should deem proper, and such rules, terms and conditions would become operative, and apply to particular parcels when the same should become designated by selection and approval, or on partition.

If the Indian title to the lands granted was not extinguished, the power to extinguish that title was vested in the government of the United States, and it became its duty to remove any incumbrance thereon.

It was not necessary that the State should be in actual possession of the lands, to authorize her to pass the act of August 8, 1848, for she could as well prescribe rules and regulations for the sale of the lands which would come to her by selection and approval, before as after those acts.

The relations of the government to the Indian tribes is of a political character, and

their rights growing out of their occupancy of the soil, cannot be brought in question in a suit between individuals, both of whom claim title through the same grant of Congress.

At the time of the passage of the act of August 8, 1848, the legislature of the State had the right and the power to prescribe the terms of sale and pre-emption, in regard to all the lands which would inure to the State, (through the process of selection and approval) by operation of the grant.

The terms of sale and pre-emption prescribed by the act of August 8, 1848, were not designed to apply to any specific lands, (for at that time there were none designated,) but were general rules to apply to any and all lands contemplated by the grant whenever any parcel in the process of executing the grant should from time to time become designated.

By the act of the legislature approved August 8, 1848, the right to enter a quarter section of any of the lands which would fall to the State under the grant in the process of its execution, at the minimum price of $1,25, was given to any one who had improvements on such quarter section at the time of the passage of that act, of the value of fifty dollars.

The act of the legislature approved June 17th, 1852, did not repeal the 42d section of the act of August 1, 1848, nor did it operate to divest the right of entry which had accrued to any person by operation of the last named act, although subsequent to the passage thereof, the tract to which such rights of entry had attached, may have become a town site.

The proceeding provided for by the act of 1853, under which this appeal is brought, is limited, special and peculiar, in which alone the simple right of entry as defined by statute, can be considered, and is in no wise adapted to the ascertaining and determining of the equitable relations, rights and obligations of the respective parties.

The doctrine of estoppel, however equitable and legal, cannot be safely applied in a special proceeding like this under the act of 1853, wherein the inquiry is limited to a conformity with statutory requisitions merely, and wherein the conduct and transactions of all the respective parties have not been and cannot be investigated, and wherein but few of the parties in interest are before the court.

This is an appeal by the appellants severally from the decision of the Circuit Court of Columbia county, on an appeal taken to that court from the dicision of the register of the State land office, touching the right of several claimants to enter the south west quarter of section five, in town twelve north, of range nine east, &c., being a portion of the land granted to the State of Wisconsin by Congress "to aid in the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal."

At the time of the passage of the act of Congress which was approved Aug. 8, 1846, by which the lands aforesaid were granted to the State, a greater part of that portion lying west and north of the Fox river was occupied by the Menomonee tribe of Indians. In October, 1848, those lands were purchased of the Indians by treaty, by the provisions of which the Indians, if they so desired, were to remain on, and occupy the lands ceded, for the period of two years, and thereafter until the President of the United States should notify them that the lands were wanted. The State of Wisconsin was admitted into the Union May 29, 1848. On the 29th day of June, 1848, the State formally accepted the grant by an act of the Legislature duly passed, and on the 8th day of August 1848, the legislature passed an act providing for the sale of the lands, and for the application of the proceeds thereof to the objects of the grant. In 1852 the Indians were removed from a portion of the lands ceded by their treaty of October, 1848, to another portion of the same, and soon after the survey and subdivision of the lands bordering upon Fox river was made. The governor of the State made his selection the 8th day of July, 1852, of the odd numbered sections, which was approved by the President of the United States, the 28th day of August following, whereby the land in dispute inured to the State of Wisconsin by operation of the act of grant approved August 8, 1846, and became subject to sale, in accordance with the laws and regulations adopted by the State.

On the 15th day of January, 1848, Richard F. Veeder made and filed with the register of the State land office, his claim of the right to enter the land in

dispute, under and by virtue of the act of the legis lature approved August 8, 1848, basing his right upon the fact of his having made thereon, previous to the passage of the act, improvements to the value of over fifty dollars. And on the 9th day of August, 1852. he again made application to enter the said land, basing his right upon the value of his improvements to the amount of over fifty dollars previous to Aug, 8, 1848.

On the 13th day of January, 1853, Nancy Mars made application to the Register of the State land office, to enter the land, claiming a right of pre-emption, in virtue of a settlement made thereon, on or about the 20th day of August, 1849, in person, together-er with her husband Sylvanus S. Mars, then living, but since deceased; and having erected thereon a dwelling house "thirty feet in length by sixteen in width, with a board roof, board floor, two windows, making it a habitable dwelling," together with other improvements made afterwards thereon. And upon the further fact, as alleged, that immediately after the decease of her husband, which occurred March 17, 1851, she commenced making improvements in her own right, and made a settlement on said land a second time in person, and for her own exclusive use and benefit, and that she continued to reside thereon.

On the 13th day of November, 1852, Joshua J. Guppey made and filed with the Register of the State land office the following application:

STATE LAND OFFICE AT OSHKOSH,
November 13th, A. D. 1852.

I, Joshua J. Guppey, County Judge in and for the County of Columbia, Wisconsin, do hereby apply to purchase lots two (2) and three (3) north east quar-

ter of southwest quarter, section number five (5) in township number twelve (12) north, of range nine (9) east, containing one hundred and seventy-five and seventy-three one-hundredths acres, according to the returns of the Surveyor General of the United States, for which I have agreed with the State Register to give at the rate of two dollars and fifty cents per acre; said entry to be made by me, in trust for the settlers on said land, by virtue of section nine of an act to provide for the completion of the Fox and Wisconsin rivers, passed April 14th, 1853.

         (Signed)          JOSHUA J. GUPPEY,
                              *County Judge.*

There were two or three other claimants before the Register, but as they have not prosecuted an appeal to this court, it is not necessary to state their claims.

The several claimants were heard before the Register, who decided in favor of the right of Veeder; whereupon an appeal was taken to the Circuit Court, where the decision of the Register was reversed, and the right adjudged to be in Guppey, as trustee &c. And thereupon Veeder and Mars severally appealed to this court.

The testimony taken was very voluminous, but for the purpose of the points adjudicated herein it will be sufficient to state briefly the substance.

On the part of Veeder it was established, that previous to August 8, 1848, he had made improvements on the land in question of the value of more than fifty dollars, and that be based his right, and made his application to enter the land upon the improvements so made under the 42nd section of the act of 1848.

On the part of Mars it was proved that Sylvanus

S. Mars, her husband, made a settlement upon the land in August, 1849, and erected a habitable dwelling thereon. That he died about the 17th of March, 1851, that the appellant, his widow, continued to reside upon the land, and subsequent to the death of her husband, claimed to have settled upon, and to occupy the same in her own right.

On the part of Guppey it was proved that this land began to be settled upon and occupied as a town site in the summer of 1850; that during the summer and fall of 1850 there were from twelve to twenty houses erected on a portion of said quarter section; and that at the time of the hearing before the Register there were about one hundred buildings and five hundred inhabitants in the town. And that the south half of said section five has been occupied as a town site since January, 1851; that a portion of the south west quarter of section five, and a portion of section eight was surveyed as a town-plat, with the knowledge and assent of Veeder; that from the summer of 1850, up to 1852, buildings were being erected thereon, during which time Veeder was cognizant thereof, and living on the land. That Veeder took an active part in surveying out the town; that he appeared anxious that the town should be built up; that he had shown persons lots of land to build upon, which would embrace portions of sections five and eight; that he had said that he would yield any claim which he might have to persons who wanted to settle on the land; that he had said no one ought to claim more than a lot or two; that Veeder also pretended to make a claim on section seven; that he encouraged people to build upon section eight; that he was one of a committee to survey out the town, and that he assisted

in the surveying. Other acts and declarations of Veeder were proved, for the purpose of showing that he intended to abandon, and had abandoned his right to enter the land.

There was also evidence tending to show that Veeder had from time to time asserted his right to enter the land, in pursuance of the Statute.

The claim of Guppey, was as trustee for the settlers on the land, claiming it as a town site, and as such, that he had the right to enter the land in behalf of, and in trust for the settlers, under and by virtue of the act of the Legislature, approved April 17, 1852.

*John Delany and A. W. Stowe*, for the appellee, Guppey.

The State had no title to the land in question prior to August 28th, 1852, and therefore could not vest a right in the land; especially a right of possession, prior to that date.

This tract of land was a part of the lands belonging to the Menomonee tribe of Indians from time immemorial until June 1st, 1852.

The property of the Indians in their lands is an absolute exclusive right of possession subject to extinguishment only by voluntary cession to the United States, and all State laws conflicting with the Indian right were and are void. *Sec.* 3 *Kent's Com.* 380 *to* 400; *Cherokee Nation vs. State of Georgia*, 5 *Peters* 1; *Worcester vs. Georgia*, 6 *Peters* 515.

This exclusive property in this land was secured to these Indians not only by the general public law declared in these cases, but by positive treaty stipulations. The United States by treaties with this tribe especially by treaty of 8th February, 1831, recogniz-

ed and guaranteed the property and possession of this land to be in these Indians, subject only to a right of purchase by the United States. This land was purchased by the United States on the 18th October, 1848, by the treaty, the Indians reserved, and the United States guaranteed to them, the right to occupy the land for two years from that date, and thereafter until notified by the President that the lands were wanted. They were never notified, but removed to land assigned them on Wolf river, June 1st, 1852. *No. i. Statute at large*, 272, 303, 312, 405, 506; 9 *Stat. at large* 954; *Pres. Message and Acc. Doc.* 1853-4 part 1, 615; *Letter of Ins. from Com. Genl. Land Office to Register at Menasha.*

The United States and all claiming under them are estopped from questioning this Indian title; and during its continuance, whatever estate they could grant would be subject to and controlled by the Indian right of exclusive possession.

By the laws of the United States the settling or marking boundaries on lands belonging or secured by treaty to Indians was a high crime and misdemeanor, punishable by fine and imprisonment. *See act of Congress of 30th March*, 1802, 2 *Stat. at large* 139.

The act of Congress under which the title to this land has vested in the State did not grant any title or right whatever to this land until the 28th day of August, 1852. The title remained in the Indians until June 1st 1852, and thereafter in the United States until selection by the Governor and approved of the selection by the President. By the act the "quantity" of land to be thereafter granted is determined, but the *location* is to be determined by the selection of the Governor subject to the approval of the Presi-

dent.    The *quantity* is to be *equal* to one half of three sections in width on each side of the Fox river and canal, the alternate sections to be reserved to the United States.    The range for selection was unlimited The Governor selected lands under the act from time to time.    He selected this land together with other tracts on the 8th day of July, 1852.    On the 28th August 1852, the President approved some of the selections last made and disapproved others.    He might have disapproved every selection and the State would be without remedy.    The lands selected, but the selection of which was disapproved by the President, have since been sold by the United States to individuals.

It was competent to the State to legislate on the subject of the disposition of the lands which she might acquire under this act, so far as such legislation was not in conflict with the paramount laws and treaties of the United States.    This the State did do, and by various acts provided for pre-emption rights. By an act entitled "An act to provide for the completion of the Fox and Wisconsin rivers," passed and published 17th April, 1852, the appellee is entitled to enter this land as occupied as a town site, and this act in terms repeals all acts and parts of acts contravening its provisions.    This act is prospective as well as retrospective, in its provisions, and the right of the appellee is based on the possession of his *cestui qui trusts* after the extinguishment of the Indian title, and after the State became seized.    The statute under which the parties claim are statutes in *pari materia*, and must be taken and construed together; hence even without the repealing clause of the last statute it would prevail as the last expression of the will of

the legislature. The several statutes cannot stand together, for each gives an exclusive right to one and the same thing to different parties.

The appellant Veeder, claims by virtue of improvements made prior to the 8th of August, 1848, and before any legislation by the State on the subject. The State law of that date provided that any claimant having fifty dollars worth of improvements on any tract of land, not exceeding 160 acres *granted* to the State previous to the passage of the law, should have the right to enter the same at $1,25 per acre. That said land should be registered, &c. The provision under which he claims, was a mere naked offer of a gift. His acts were prior to the passage of the law under which he claims, and of course could not be made in contemplation of it. The proposal on the part of the State was subject to be withdrawn at any time before it was carried into effect. Veeder never registered this land under the act. He disclaimed all right and intention to claim it, both to the *cestui qui trusts* of the appellee, and to the legislature, by petition. He joined with others in a common survey of the land into lots, blocks and streets. He refused to accept of the proposal of the State, and encouraged the settlement of the tract as a town site, all before the passage of the law of the 17th April, 1852. Even if a right could have been vested in him prior to that date, he had abandoned it, and is estopped from now asserting it, either against the State or the appellee.

The appellant Marrs claims in the right of her husband, of whom she is not heir, and several heirs are living. See testimony and laws, 1849, p. 76. She never registered her claim, nor did her husband, as

required. At the time of her application to enter, the land was used for purposes of trade and not agriculture, and therefore not subject to entry under the sections of the law under which she claims. And the settlement by which she claims was during the continuance of the Indian title.

The 6th resolution appended to and made part of the Constitution, controls legislation on this subject, and provides that these lands shall be sold, subject to the same rights of pre-emption as allowed by law to settlers on the public lands.

By the laws of the U. S., the appellee could, and the appellants could not, enter this land. (See acts of Congress of 23d May, 1844, and 4th September, 1841. Also letter to Commissioner of General Land Office to Register at Menasha.

There was a time when the title to this land, having passed from the Indians, was in the U. S. prior to the accruing of the land to the State.

*Harlow S. Orton* and *David J. Pulling* for the appellant Veeder, made several preliminary objections to the time and manner of taking the appeal to the Circuit Court, and to the form and character of the order of that court.

They also contended that the act of 1853, providing for appeals from the decision of the Register, applied only to "conflicting *pre-emption* claimants," and that Guppy was not, and could not be construed to be a "pre-emption claimant." He claimed not in his *own right*, which was essential to the validity of a pre-emption claim, but in the right of, and for the benefit of others, that the act of 1853 applied to individual claimants whose personal rights might come in conflict; and hence Guppy could not interpose a

conflicting claim in the character in which he assumed

to act, to defeat the claim of the appellant.

Also, that it did not appear by the evidence that the lands which Guppy sought to enter, were "settled as a town site," or how much, if any, was so occupied, but that it did appear, if any were so occupied, it was only a portion of the land claimed.

The counsel for the appellant Veeder, further contended, that the act of Congress approved August 8, 1846, vested the title to the lands in the State of Wisconsin, on the admission of the State into the Union, May 29th, 1848, and the title became fixed and perfect at all events by the passage of the act of June 29th, 1848, by which the State formally accepted the grant. That whenever the lands should be selected and the selection approved, the title would relate back to the date of the grant.

That the right or power of the United States to make a grant of its lands cannot be disputed by a citizen of the government, both parties claim from the same source, and originally through the same grant, that the entry and occupation of the "settlers" was as much a trespass or outrage upon Indian rights as the improvements made by Veeder.

And further, the counsel contended that Veeder had an absolute right to enter the land by virtue of his improvements made thereon previous to the passage of the act of August 8, 1848, under the provisions of the 42d section of that act.

_A. L. Collins_, for the appellant, Nancy Mars, claimed the right to enter the land in virtue of a _settlement_ made thereon, in pursuance of the 38th section of the act of August 8th, 1848.

34

And she claimed the right in preference to Veeder, because after her settlement, as well as before, he disclaimed by word and deed, any pre-emption right. That, whether he claims now under the 38th or 42d section, by disclaiming all right of pre-emption, by encouraging others to settle on the " disputed territo. ry," even urging Mars to settle, and by advising and urging others, and aiding himself in building a village or town, and platting the land for that purpose, he is effectually estopped from setting up any claim to enter the land.

And the claim of this appellant should be preferred to that of Guppy, the appellee, because having been a settler and claimant at the time the land became the property of the State, and at the time of the enactment under which the appellee claims, the land, though a " town site," was not a town site with her assent, but in spite of her, was nevertheless subject to entry by her. The act of the 17th June, 1852, under which Guppy, the appellee, claims, does and could only authorize the entry of such lands as are not subject to private entry. This last act is no more operative upon the land in question, than all other acts of the legislature concerning it, for the title of the State and the right to legislate, grant rights and privileges, &c., was the same at the dates of the several enactments touching said " Improvement lands."

*By the Court*, SMITH, J. This cause came to this court under and by virtue of the provisions of chapter 1 of the Session Laws of 1853, entitled " An act to allow appeals to be taken from the decision of the register of the land office," approved February 1,

1853. This act provides that in all cases of conflicting pre-emption claims, which may be decided by the register of the State land office, after the 15th day of January, 1853, it shall be lawful for the party aggrieved by such decision, to appeal to the Circuit Court of the county in which the land lies, within sixty days after the decision of the register; and until the expiration of sixty days, the register shall issue no certificate to the successful claimant; and in case of appeal, no certificate shall be issued until the decision of said court shall be made and certified to the register.

Section seven of the same act provides that "the cases provided for in this act may be removed to the Supreme Court by appeal or writ of error, as in other cases, and the said court shall, on the hearing, of any such case, by order, affirm or reverse the order of the court below."

The claims of the respective parties grow out of the act of Congress, entitled "An act to grant a quantity of land to aid in the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal in the Territory of Wisconsin," approved August 8, 1846, and the several acts of the legislature of the State in relation to the lands granted by that act of Congress.

The act of Congress is as follows: "That there be, and hereby is, granted to the State of Wisconsin, on the admission of such State into the Union, for the purpose of improving the navigation of the Fox and Wisconsin rivers, in the Territory of Wisconsin, and of constructing the canal to unite said rivers, at or near the Portage, a quantity of land equal to one-half of three sections in width, on each side of the said

Fox river, and the lakes through which it passes, from its mouth to the point where the Portage canal shall enter the same, and on each side of said canal, from one stream to the other, reserving the alternate sections to the United States, to be selected under the directions of the governor of the State, and such selection to be approved by the president of the United States"

By an act of the legislature, approved June 29th, 1848, the State formally accepted the grant.

By the second section of the act of Congress of 1846, it is provided and declared, "That as soon as the Territory of Wisconsin shall be admitted as a State into the Union, all the lands granted by this act shall be and become the property of said State, for the purposes contemplated by this act, and no other; provided, that the legislature shall agree to accept the grant upon the terms specified in this act, and shall have power to fix the price," &c.

It seems to be conceded that nearly all, or by far the greater portion, of the lands on the north and west side of the Fox river, were, at the time of the grant, what are called "Indian lands"; that is, they had not yet been purchased of the Menomonee tribe of Indians, who held the Indian title.

The State was admitted into the Union May 29th, 1848.

October 18th, 1848, the United States, by treaty, purchased the Indian title of the Menomonees to a large tract of land, of which the lands granted were a part, which treaty was ratified January 23d, 1849.

By the eighth article of the treaty, the Indians were permitted, if they desired so to do, to remain and occupy the lands for the term of two years from

the date of the treaty, and thereafter until the president of the United States should notify them that the lands were wanted by the government.

There was never any formal notice that the lands were wanted by the government; but the tribe continued their usual occupation of the tract purchased, until the summer or autumn of 1852, when they were removed to a portion of the lands ceded by the treaty near the falls of Wolf river. The legislature of the State of Wisconsin, by an act entitled " An act to provide for the improvement of the Fox and Wisconsin rivers, and connecting the same by a canal," approved August 8, 1848, provided for the sale of the lands, and the application of the proceeds to the improvement contemplated by the grant.

The reason for early legislation by the State on the subject may be found in the third section of the act of Congress, which provides " That the said improvement shall be commenced within three years after the said State shall be admitted into the Union, and be completed within twenty years, or the United States shall be entitled to receive the amount for which any of said lands may have been sold by the said State."

The thirty-eighth section of the act of the legislature, approved August 8, 1848, provides as follows : " From and after the passage of this act, every person being the head of a family, or widow, or single man over the age of twenty-one years, and being a resident of the State of Wisconsin, who has made, or who shall hereafter make a settlement in person on any of the lands granted by the United States to said State to aid in the improvement of the Fox and Wisconsin rivers, and who shall inhabit and improve

the same, and who has erected or shall erect a habitable dwelling thereon, shall be, and he hereby is authorized to enter with the register appointed to sell said lands by legal subdivisions, any number of acres, not exceeding one hundred and sixty acres, to include the residence of such claimant, upon the payment to the treasurer of one dollar and twenty-five cents per acre for such lands, subject to the following limitations."

The only limitation necessary to be noticed is the following : " No lands required for the use of the State in constructing the said improvement of the said rivers, or returned by the board of public works as a site for hydraulic or commercial purposes, and no parcel or lot of land occupied for purposes of trade, and not agriculture, shall be liable to entry under the provisions of the last section."

Another right of entry is provided for by the forty-second section of the same act :

"Any tract of land not exceeding one hundred and sixty acres, having improvements by cultivation on the same to the amount of five acres, or on which a house or other improvements have been erected, worth fifty dollars, previous to the passage of this act, shall be registered as improved or occupied lands, and the claimant of said land shall have the right to purchase the same at one dollar and twenty-five cents per acre ; provided, however, if any of said lands registered shall be wanted for carrying on said work on account of material, or by reason of including the termination of a canal, or any lock, dam, waste water or basin, or on account of flooding the same, said land shall be reserved, and an equivalent of land may be selected by said claimant from some other of the ap-

propriated lands, not reserved as aforesaid, and on his
application the lands so selected shall be registered
in the same manner as if the same had been occupied
or improved by such claimant, and said claimant shall
be entitled to receive a just compensation for his im-
provement, to be agreed upon by the person claiming
the same and the commissioners, or three disinterested
persons to be chosen by the said parties."

By the act of the legislature published April 17,
1852, it is provided that "Whenever any portion of
said lands has been or shall be settled upon and occu-
pied as a town site, and therefore not subject to entry
under any existing pre-emption law of this State, it
shall be lawful, in case such town shall be incorpora-
ted, for the corporate authorities thereof, and if not
incorporated, for the judge of the County Court for
the county in which such town may be situated, to
enter at the State land office, at the minimum price
of two dollars and fifty cents per acre, the land so
settled and occupied, in trust for the several use and
benefit of the occupants thereof, according to their
respective interests," &c.

Under this last act, the appellee, Judge Guppy, ap-
plied to the register of the State land office to enter
the tract of land in question.

Under the thirty-eighth section of the act of Au-
gust 8th, 1848, the appellant, Nancy Mars, applied to
enter the same tract, by virtue of her *settlement* made
thereon the 29th day of August, 1849.

And under the forty-second section of the same act,
the appellant, Richard F. Veeder, applied to enter the
same land by virtue of his improvements thereon to
the value of more than fifty dollars, prior to the pas
sage of the act of August 8, 1848.

These are the laws, and the position of the parties before the court, and the rights of the respective parties depend upon the proper construction to be put upon the act of Congress making the grant, and upon the several acts of the legislature in relation to the lands comprehended by the grant.

It is unnecessary at this day to go into an inquiry as to the power of the United States to grant the lands in question, or of the title which the grant by the United States carried to the State of Wisconsin. The former was the absolute owner in fee of the lands, subject only to such rights as the Indians might have therein; and of those rights, and the manner of divesting them, the United States was the sole and only judge. Whether the Indian title should be extinguished by purchase, or by conquest, by the general government, the State of Wisconsin was wholly unconcerned. It was sufficient for the State that it had the power to take, and that the United States had the power to grant.

The grant took effect, and the title to the lands vested, potentially, in the State, on its admission into the Union, of and to a quantity of land equal to three sections in width on each side of the Fox river. In the early part of the argument it seemed to be a question with counsel whether the grant located the lands, or did any more than to define the quantity granted; but it was understood to have been finally admitted, that the location of the lands was fixed by the grant and established, as the alternate sections on each side of the Fox river. The quantity then became definite, and the location sufficiently certain for the purpose of legislation; for it required only the ministerial acts of selection, approval and survey to

render the specific parcels which would fall to the State or to the United States, certain and definite.

The State being seized of one half of the lands on both sides of the Fox river, (except those already appropriated by the United States,) and the mode of partition established, it was competent to the State to prescribe the mode and terms for the sale and disposal of the lands granted to her, which mode and terms would apply to the specific lands of the State as soon as partition was made, unless the alleged right of occupancy by the Indians prevented such legislation.

It is said the Indian title to the lands on the south and east side of the Fox river, was extinct at the time of the grant, and that the legislature contemplated only lands of this class by the act of August, 1848. That that act could not have been intended to embrace the lands to which the Indian title had not been extinguished, because any settlement upon such lands was in contravention of the laws and treaties of the United States.

The short answer to this proposition is, that the law of 1848 makes no distinction whatever between any of the lands comprised in the grant. The regulations for the disposal and use of the lands are general, and by the terms of the act apply equally to all portions. There is no reservation or discrimination of any kind, but general rules are adopted by which the rights of the State and its citizens shall be determined, when the lands are or shall be in a condition to be sold. At the time of the passage of the act, none of the lands had been selected by the governor, and approved by the president. But the title of the State was as complete as it ever has been, to the cer-

tain quantity of land granted. No further act of the United States was necessary, nor was any other act ever done or performed to vest the fee in the State. The selection by the governor and the approval by the president, were acts of partition only, not of conveyance. They tended in no degree to enlarge the scope of, or confirm the grant. The State being the owner of the land, had a right to prescribe such rules, terms and conditions, to the disposal of the lands granted, not inconsistent with the terms of the grant, as it should deem proper, and those rules, terms and conditions would become operative on partition, and apply to particular parcels when the same shall become designated. If the United States could convey a perfect title, the State could take it. There is no reservation or mention of any outstanding, conflicting title, made in the grant. There is no restriction upon the State, of its power to grant pre-emption rights, at all relating to the questions involved in this case; but so far as these questions are concerned, the title in the State is as full and complete as that of any other sovereign land holder.

Nor, is it easy to perceive the bearing which the Indian right of occupancy has upon the power of the State to legislate upon the subject of their lands. That matter rests wholly with the federal government. If that government granted lands to the State, to which it had not yet extinguished the Indian title, it was its duty at once to procure such extinguishment, that the grant might have its full effect, unencumbered. The State had no power to move for its extinction. It could only look to the United States to make good the title to the lands granted. If the title or possession of the State should be opposed by

JUNE TERM
1854.

Veeder
vs.
Guppy.

an adverse title in the Indians, she could not enter into treaty with the latter for its extinction. She could only look to the United States, who had the sole power to treat with the Indian tribes. So long as she was unmolested by any Indian occupancy, and no title or right asserted incompatible with the grant, she had no cause of complaint against her grantor. If the United States, in making this grant, violated its obligations to the Indians, that was a matter with which the State had nothing to do. As the federal government made no reservation on account of the Indian title, the State government was not bound to regard it. And it would seem that the federal government did not regard it in connection with and upon the narrow strip comprised in the grant, for the State was required to commence the work within three years or forfeit the benefit of the grant. The work could scarcely be commenced without the necessity accruing for using at least some of the lands, or at least entering upon some of the lands on the north and west side of the river. Indeed, the whole tenor of the act of Congress making the grant, seems to be regardless of the Indian title, and in the full expectancy of its immediate extinguishment. With such expectation and confidence doubtless the grant was made. A treaty, if not then in process of negotiation, was immediately entered upon, after the admission of the State, between the United States and the Indians, and was concluded the 18th of October following, scarcely four months after the acceptance of the grant by the State. And if the privilege conceded to the Indians to occupy the lands ceded for two years, and thereafter till they should be notified that the lands were wanted, had been considered by either party an

impediment to the reasonable use by the State, of the small quantity granted for the improvement, is it to be supposed that the treaty would have been silent as to the rights of the State conferred by the grant, especially when the State was bound to commence the work within three years, or forfeit the lands granted? Would the United States thus deprive the State of two years of the time within which the work was to be commenced?

Nor is there good reason for supposing that the provision for an approval of the selections made by the governor, by the president of the United States, was intended to protect the Indian title to the land north and west of the Fox river. The grant is so specific as to leave little room for selection. It carried the alternate sections on each side of the Fox river and the lakes through which it passes. It would seem that there was but a narrow scope for choice, and the terms of approval by the president apply as well to those lands to which the Indian title was extinguished, as to those to which it remained, as well to the odd as to the even numbered sections, as well to the lands unsurveyed, as to those surveyed.

If the selection by the governor, and approval by the President, was essential to vest the title in the State, the act of the legislature of August, 1848, is inoperative and void, unless it has a retroactive operation upon such settlements as should chance to be upon the lands which might fall within the grant, upon partition, for at the date of the act no selections and approvals were made.

If the act of the legislature became operative upon such settlements as were made in or before 1848, and should chance to fall upon the lands selected and ap-

proved, then it must operate equally upon all, for the terms of the act are general, and the rights granted by it would vest as soon as the selection and approval were made.

But we think it is clear that the legislature had the right to say to whom, on what conditions, on what terms of pre-emption or other purchase, (so that they were as favorable as those granted by Congress to settlers on public lands,) any of the lands that might take by virtue of the act of Congress of 1846, restricted only by the terms of that act. It was not necessary that the State should be in possession to authorize her to pass the act of August, 1848. The grant was actually made, and wanted only the survey, the selection and approval, in order to specify the particular parcels, which were certain to be made, and she could as well prescribe the rules and regulations for their sale, before as after survey, selection, approval and possession.

Although the quarter section in dispute in this case was not specifically, yet it was potentially granted by the act of Congress of 1846.

It is well settled that the possession of a tract of land by the Indians, does not affect the validity of a grant by the government to a State, or to a citizen, made without the consent of the Indians. Our relations with those tribes are held to be of a political character, exclusively; (*Cherokee Nation vs. Georgia*, 5 *Pet.* 1,) and their rights growing out of their occupancy of the soil, cannot be brought in question, in a suit between individuals, especially where both parties claim through the same grant of Congress. The power of the government to grant, and the capacity of the State to take cannot be doubted. It was pure-

ly a question of policy with the general government, whether it would grant the lands before the Indians were removed from possession. Neither of the parties here derive or claim title or right through the Indians, but all claim under and through the same source. Nor does there appear to have ever been any controversy with the Indians in regard to the lands granted by the act of Congress. *See Jackson Exdem. Klacker vs. Hudson,* 3 *J. R.* 375 ; *Fletcher vs. Peck,* 9 *Cranch.* 37 ; *U. S. vs. Clark,* 9 *Pet.* 168 ; *Clark vs. Smith,* 13 *id.* 195 ; *McIntosh's Lessee vs. McIntosh,* 8 *Wheat.* 543.

Very soon after the grant took effect, in October, 1848, the United States made a treaty, for the purchase of the entire Menomonee tract, which took effect upon its ratification, in January, 1849. From that time the Indians were mere tenants, occupying under the United States.

But it is contended that, as the act of Congress of 1802, made it a penal offence to trespass upon the Indian lands, and as the Indian title to a part of these lands was not extinguished at the time of the admission of the State, and to a part of them it was extinguished, the act of the legislature of 1848, ought to be so construed as to apply its provisions to that portion only to which the Indian title was extinct; that it cannot be supposed that the legislature intended to apply the 38th and 42nd sections of the act of 1848, to lands upon which entry was not only forbidden, but rendered penal by the laws of Congress. If, however, the federal government had the power to grant the lands, and did grant them, by the act of 1846, which grant would take effect on the admission of the State, it may well be asked whether the gov-

ernment did not, by the force and effect of the grant virtually suspend the operation of such penal laws in respect to the particular lands granted  It may well be said, that as the grant was without reservation, the general government took upon itself the arrangement of any claim of title in the Indians.  At all events, we think that is a matter resting solely with the general government, and cannot be urged here by disputing claimants under the laws of the State, either as affording a rule of construction of the statutes of the State, or in depreciation or limitation of the grant trom Congress upon which all the parties primarily base their claim.  It was competent for the government to make the grant, and to arrange the claims of the Indians, if any they had, in its own way.  If the rights of the Indians were infringed by the grant or its consequences, the United States government were bound to make adequate compensation, but what redress or compensation was, or might be made, or whether any was claimed, or whether any actual injury was suffered, were matters exclusively within the cognizance of that government ; and it is not for rival claimants to these lands, citizens of the State, to call the State or the United States to account for the manner in which they have derived or conveyed title, nor to inquire in what manner the government has, or may arrange with the Indians their alleged right of possession.

The grant took effect, potentially, carrying the alternate sections, on each side of the Fox river, on the admission of the State into the Union, the 29th of May, 1848.  Although the particular alternate sections were not set apart and specified, yet as such specification only required the selection of the gover-

nor and approval of the president, of the particular series of alternates, the grant was sufficiently certain for the purposes of legislation, and for the prescription on the part of the State, of the rules and regulations which should be observed in their disposition and sale; for in law that is certain which is capable of being reduced to a certainty.

If these reviews be correct, it follows that in 1848, at the time of the passage of the act of the legislature before referred to, the legislature had the right and the power to prescribe terms of sale, and of pre-emption in regard to all the lands which by the simple process of selection and approval, should fall to the State by the terms and operations of the grant. The terms of sale and pre-emption prescribed by the act of 1848, could not apply to any specific lands, for at that time none of the lands were specified by selection and approval, or otherwise, but they were general rules, to apply to any and all lands contemplated by the grant, whenever any parcel, by the process of carrying out or executing the grant, should, from time to time, become designated. Any other construction of that act of the legislature, would render the 'whole act in relation to sales and pre-emptions, wholly inoperative and void, and would practically prevent the State from commencing and carrying on the work until such time as the general government should see fit to remove the Indians and formally extinguish their title, and compel a forfeiture of the lands granted, by withholding possession, and rendering the commencement of the work within three years, impracticable.

But the State did not thus construe the act of 1848, or the act of Congress of 1846, for the same legisla-

ture that passed the act of 1848, provided for the establishment of a land office at Oshkosh, and for the appointment of a register and receiver, for the appointment of a board of commissioners to carry on the work, prescribing their duties, and the same legislature also proceeded to appoint their officers, who at once entered upon the performance of their duties.

Richard F. Veeder, Nancy Mars, and Joshua J. Guppy, as trustees for the settlers, &c., are the parties before the court.

Veeder made claim, and now claims to enter the the land, with the register of the State land office, under the 42nd section of the act of the legislature of 1848, by virtue of his having had improvements upon this tract of land at the time of the passage of the act, of the value of more than fifty dollars.

Nancy Mars made claim and now claims to enter the land under the 38th section, by virtue of a *settlement* made thereon by herself and husband, (since deceased,) the 20th day of August, 1849, aad by herself the 17th March, 1851, in her own right.

Joshua J. Guppy made claim to enter the land as trustee for the settlers thereon, by virtue of the 9th section of the act of the 14th April, 1852, which provides that "whenever any portion of said lands are, or shall be settled upon, and occupied as a town site, and therefore not subject to entry under any existing pre-emption law of this State, it shall be lawful, &c.," providing that the county judge may enter the land in trust for the settlers, &c.

It is claimed in behalf of Guppy that the Indian title did not become extinct until August, 1852, when the Indians were removed, and that inasmuch as, when that title became thus extinct, this tract

35

was found already settled and occupied as a town site, the right of Guppy accrued.

But at the passage of the act of April 17, 1852, this land, according to the reasoning of the counsel for Guppy, was Indian land, and the act could no more apply to this land, in behalf of the settlers, than could the act of 1848 in behalf of Veeder or Mars.

If the act of April 17, 1852, could potentially apply to such Indian lands as might chance to be occupied as a town site at the time when the Indian title should thereafter become extinct, so could the act of 1848, potentially apply to such lands as should fall within the 38th and 42nd sections of that act.

The settlers upon this tract were as much trespassers as were Veeder or Mars, and if no right could accrue to the latter under the act of August 8, 1848, neither could any accrue to the former under the act of April 17, 1852, at the time of their entry or settlement.

If, in August, 1852, when the Indians were removed, the act of April 17, 1852, became operative upon the land, and found it occupied as a town site, so did the act of August 8, 1848, apply and find it occupied and improved by Veeder, and settled upon by Mars.

If it is claimed that, in August, 1852, when the Indians were removed, the act of April 17, 1852, vested the right to enter, in Guppy as trustee for the settlers, by virtue of the occupancy of the latter, by the same force of reason did the act of August 8, 1848, vest the right to enter the land, in Veeder, for at the time of the passage of both acts, the Indian title or possession remained unextinguished, upon the hypothesis of the counsel for Judge Guppy.

If the act of April 17, 1852, found this quarter section occupied as a town site, at the time of the supposed extinction of the Indian title, in August, 1852, so did the act of August 8, 1848, find this quarter section with improvements on it, made by Veeder, under and within the provisions of the last named act.

The *cestui que trusts* of Guppy must accord the same rule of construction to Veeder and Mars, which they claim for themselves. If they were all trespassers, *in pari delicto*, when both acts were passed, (neither repealing the other) the claims of both or either would hold according to a proper construction of both acts. If the acts of the Legislature applied to neither, no right would vest. If both acts are to be so construed, as that both may stand if possible, then that right would be upheld and secured which first vested.

But this hypothesis of the counsel for Guppy cannot be admitted, for reasons apparent from a consideration of the propositions above stated.

When the State accepted the grant, as she did by the act before quoted, (*Sesston Laws of June*, 1848, *page* ——) the State became tenant in common with the federal government, of all the lands within the locality of the grant, with the process of partition prescribed and fixed ; and she had then the right to prescribe by the act of her legislature, by what rules, regulations and conditions the specific lands, which should fall to her, on partition, should be disposed of, so that she kept within the terms of the grant.

The State had a right to say that if, when partition should be made, and the lands should be specifically defined, any person having improvements on

such parcel as should fall to the State, should have the right of pre-emption.

The State actually did, not only this, but more than this, by the act of August 8, 1848, for by the 42d section of that act, it is provided that lands having improvements thereon to the value of fifty dollars, should be registered, as occupied lands, and the person, having such improvements, should have the right to enter, unless the lands were wanted for the purposes of the improvement, &c.

The right to enter was expressly given to such as had improvements at or before the passage of the act, and it applied by its terms to the whole grant.

Then any one, who at the time of the passage of the act of August 8, 1848, had the requisite improvement on any of the lands granted, which, on partition should fall to the State, took by virtue of that act, the right to enter such land in accordance with the provisions of the act—for the 42d section expressly applies to such improvements made *previous* to the passage of that act.

The State having the power to vest such right of entry, on the passage of the act of 1848, that right became vested in such persons as had the requisite improvements, and, as at the time of the passage of the act it could not apply to any specific parcel, because, as yet, no partition, or selection and approval, had been made, the right partially vested, to all such lands within the grant as should fall to the State.

If it is said that Veeder was a trespasser in August, 1848, it is replied, that so were the settlers in April, 1852. If, the instant of the extinction of the Indian title broke upon Veeder as trespasser, so did it break upon Guppy's *cestui que trusts*. The same

prospective or retrospective scope must be given to the act under which Veeder claims, as to the act under which Guppy claims.

But neither the occupation of Veeder, nor the settlement of Mars, nor that of the settlers, was an act *malum in se*, but was merely *malum prohibitum*. For aught that appears, Veeder's occupation may have been lawful. He may have had license from the United States. In any event, neither the State nor the parties here litigant can set up such trespass, if any there was, to defeat or control the operation of the act of the legislature of the State.

Whether the legislature of 1848 was wise, or whether or not it was sufficiently guarded, or whether it was made under a misapprehension of its legal consequences, is a question with which we have nothing to do.

Nor have we anything to do with these alleged trespasses. That was a matter of which the federal government alone had cognizance and sole jurisdiction.

It is conceded as a fact, that Veeder, at the time of the passage of the act of August 8, 1848, had the requisite improvement on the south-west quarter of section five, to entitle him to enter the land under the provisions of that act, and that ultimately, in process of partition, by selection of the governor and approval of the president, that quarter section came to the State by operation of the grant.

We think, therefore, that on the taking effect of the act of August 8, 1848, the right of Veeder became vested, subject only to the contingency of that tract of land falling within the grant to the State. That on partition and the title to that specific par-

cel of land vesting in the State, the right of Veeder to enter it, vested in him.

The subsequent act of April 17th, 1852, could not have an *ex post facto*, or retrospective effect to divest Veeder of his right, because it had, subsequently to the passage of the act of 1848, become a town site. Although Veeder may have laid it out as a town site, in the full belief that the title would come to the State, and his right to enter thereby vest in him, the legislature could not, in 1852, pass an act to divest him of his right already actually or potentially vested. He may have incurred equitable liabilities to settlers, which a Court of Equity would enforce. But of that we have no concern now.

If Veeder's right potentially vested on the passage of the act, the subsequent settlement of Mars could constitute no claim adverse to his, though equitable relations may have been created, of which we are not, and cannot be informed in this proceeding.

This may be a hard case. It has been so suggested to us, and the argument of expediency has been falteringly urged in behalf of the settlers. But we have no power to entertain considerations of that kind. The law, in all its sternness, is presented as our only rule of action, and from its requirements we have not, even if we sought it, any means of escape. We are not unmindful of the consequences of our determination, and a consciousness of them has had the only effect which, it is presumed, counsel desired, to ensure a more earnest, careful and solemn investigation of the legal rights of the parties.

As we view the law of this case, we think the settlers could not by virtue of their settlement prior to the act of 1852, nor by virtue of their actual occu-

pancy of the land as a town site, at the time of the removal of the Indians, acquire any rights under that act, which would divest any individual, who had acquired rights under the act 1848. If the latter act did not, actually or potentially, vest any rights to what are called Indian lands until the removal of the Indians, neither did the former act, and if these acts become operative upon this tract simultaneously, then the rights of all parties must be settled by the priority of legislative action, because neither act in any manner repeals the other.

Consequently Judge Guppy had no right to enter this land in trust for the settlers.

It may, perhaps, be proper to say a few words in regard to the doctrine of *estoppel*, which has been urged by counsel with a good deal of energy. This doctrine is both equitable and legal, and will always be applied by courts, both of law and equity, in all proper cases. But it is a doctrine to be applied with caution, upon well-ascertained facts, and between the proper parties. This, however, is neither a proceeding at law, nor in equity, properly so called, but a peculiar statutory proceeding, wherein we are seeking to ascertain the conformity or non-conformity with certain statutory enactments, by operation of which certain rights are granted and secured. The conduct of all the parties, their equitable relations, rights and duties growing out of their transactions, have not been, nor can they be fully investigated in a proceeding like this. Nor, have we all the parties in interest before the Court. To attempt to apply the doctrine of *estoppel* to one of the parties in this proceeding, without knowing upon whom else it is to operate, or whether those enjoying it are the persons

equitably entitled to its benefits, might operate very unjustly.   We are satisfied that we could not safely apply it in a proceeding of this limited and restricted character, if it were applicable herein.   But we are satisfied that it is not, and that our power is confined to the investigation of the rights of the parties as the statutes have defined them, and that it is not only our strict duty, but that it is far safer to leave them in their statutory rights, and to leave their equitable relations and obligations to the process and the forum, whereby and wherein all may be fully heard upon adequate and competent issues, and complete justice be done to each and all.

The judgment of this Court is, that the order and judgment of the Circuit Court be, and the same are hereby reversed.