## SPAULDING et al., *vs.* MARTIN, et al.

ERROR TO CIRCUIT COURT, MILWAUKEE COUNTY.

Heard April 19.]                                     [Decided June 4, 1860.

*Public Lands—Grants—Reservations.*

Congress granted to the State of Wisconsin, the odd numbered sections lying within three miles of the Fox river, for the purpose of improving the same. The governor selected the odd sections and the president approved the grant. Held that this grant, selection and approval did not operate to give the state the title to section 33, on which Fort Winnebago was located, and which was at the time a military reservation, used as such by the war department, although it lay within the limits of three miles, but the same was liable to be sold by the department when the same had become useless for military purposes.

*Veeder vs. Guppy,* 3 Wis., 502, considered and distinguised.

This is an action to recover possession of lot five, of section thirty-three, township 13, of range 9 east, in Columbia county, the complaint was in the usual form, and was filed originally in the circuit court for Columbia county, but " for the convenience of witnesses and the furtherance of justice," the place of trial was changed to the county of Milwaukee, by order of court. The answer was a general denial, and on the trial the parties agreed to the following state of facts in the action. That the tract of land lying on the south side of the Fox river, in the county of Columbia and state of Wisconsin, and known as Fort Winnebago, had been surveyed prior to February 1835, by the authority of the United States. That on the 28th day of February, 1835, the President of the United States, by authority of law, reserved section No. 33, in township No. 13, north of range No. 9 east, among other tracts, for military purposes, which together constitute what is termed " Fort Winnebago." That lot " five " of section 33, the lot in controversy, is a portion of the land covered by the reservation of the 28th of February, 1835.

That on the 8th day of August, 1846, Congress passed an act entitled " An act to grant a certain quantity of land to aid in the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal, in the territory of Wisconsin."

Sec. 1 of that act provides "that there be and hereby is granted to the state of Wisconsin, on the admission of such state into the Union, for the purpose of improving the navigation of the Fox and Wisconsin rivers, in the territory of Wisconsin, and of constructing the canal to unite the said rivers, at or near the portage, a quantity of land equal to one half of three sections in width on each side of the said Fox river, and the lakes through which it passes, from its mouth to where the Portage canal shall enter the same, and on each side of said canal from one stream to the other, reserving the alternate sections to the United States; to be selected under the direction of the governor of said state, and such sections to be approved by the president of the United States. The said rivers, when improved, and the said canal when finished, shall be and forever remain, a public highway for the use of the government of the United States, free from any toll or other charge whatever for the transportation of the mail, or any property of the United States, or persons in their service, passing upon or along the same.

" Sec. 2. That as soon as the territory of Wisconsin shall be admitted as a state into the Union all the lands granted by this act shall be and become the property of said state for the purpose contemplated in this act and for no other. Provided, That the legislature of said state shall agree to accept said grant upon the terms specified in this act, and shall have power to fix the price at which said lands shall be sold, not less than one dollar and twenty-five cents the acre, and to adopt such kind or plan of improvement on said route as the said legislature shall from time to time, determine for the best interest of the state. Provided, also : That the lands hereby granted shall not be conveyed or disposed of by said state, except as said improvement shall progress. That is, the said state may sell so much of said lands as shall produce the sum of twenty thousand dollars, and then the sales shall cease until the governor of said state shall certify the fact to the president of the United States, that one-half of said sum has been expended upon said improvements, when the said state may sell and dispose of a quantity of said lands sufficient to reimburse the amount expended, and then the sales shall progress as the proceeds thereof shall be expended, and the fact of such expenditure certified in the manner herein mentioned.

" Section 3. That the said improvement shall be commenced within three years after the said state shall be admit-

ted into the Union, and completed within twenty years, or the United States shall be entitled to receive the amounts for which any of said lands may have been sold by said state. Provided, That the title of purchasers under the sales made by the state, in pursuance of this act, shall be valid."

On the 3d day of March, 1847, Wisconsin was contingently admitted into the Union, and absolutely admitted on the 29th day of May, 1848.   9 U. S. Stat. at Large, 178 and 233. On the 29th day of June, 1848, the legislature of Wisconsin accepted the grant of August 8th, 1846.   Rev. Stat. Wis., 765. In June, 1848, on the acceptance of the grant by the state, Governor Dewey, in behalf of the state of Wisconsin, selected the unsold lands in the odd numbered sections lying within the limits of the grant, as those which the state would take under the act of 1846.   In November, 1848, the Commissioner of Public Lands, concurred in the selection by directing the register and receiver at the land office, at Green Bay, to enter on the record and plats, all the unsold lands within the grant, in the odd numbered sections as selected by Wisconsin.   On the 3d day of March, 1849, Congress passed an act entitled an act in relation to the Fox and Wisconsin River Reservation, in the State of Wisconsin, as follows:

"All land entries made in the Green Bay land district, in the State of Wisconsin, upon the odd numbered sections of the Fox and Wisconsin River Reservation in said state, subsequent to the passage of an act entitled 'An act to grant a certain quantity of land to aid in the improvement of the Fox and Wisconsin rivers, and connect the same by canal, in the territory of Wisconsin,' approved on the 8th day of August, eighteen hundred and forty-six, be, and the same are hereby declared to be good and valid, as though said act had not been passed: Provided, nevertheless, that the governor of said state is hereby authorized to select the same quantity of other lands in lieu thereof, subject, however, to the approval of the President of the United States.

"Section 2.   All similar entries made upon the even numbered sections of said reservation, be also declared to be as good and valid as though said reservation had not been made."

After the passage of the act of the 8th of August, 1846, Fort Winnebago ceased to be actually occupied as a military post, though it continued to be held under the order of reservation of 1835, by the United States, until the beginning of the year

1854, when it was abandoned as a military reserve by the government of the United States, and having become useless for public purposes, the usual and proper notice of abandonment as a military reservation was given through the war and interior department at Washington.

In May, 1854, lot five in section thirty-three was sold and conveyed by patent under the direction of the war department of the United States to James B. Martin, one of the defendants in this action, by deed bearing date May 9th, 1854, under act of Congress, approved March 3d, 1819.

The act of March 3d, 1819, entitled an act authorizing the sale of certain military sites, is in the following words:

" The Secretary of War be, and is hereby authorized, under the direction of the President of the United States to cause to be sold, such military sites belonging to the United States, as may have been found or become useless for military purposes.

"And the Secretary of War is hereby authorized, on the payment of the consideration agreed for, into the treasury of the United States, to make execute, and deliver all needful instruments, conveying and transferring the same in fee, and the jurisdiction which had been specially ceded for military purposes to the United States by a state over such site or sites, shall thereafter cease."

It is further admitted, that section thirty-three aforesaid, lies within the limits of the grant of the 8th of August, 1846. That it was unsold by the United States at the time of the passage of said act.    That the selection of the odd numbered sections within the limits of the grant aforesaid, made by Governor Dewey, aforesaid, embraces all the odd sections within the limits of the grant, which had not been disposed of prior to the passage thereof, and which were not excepted by the grant itself, and that in September, 1857, the Governor of Wisconsin made a special selection of the said section thirty-three, under the act of August 8th, 1846, in part satisfaction of the grant.    All the right, title, and interest, and possession of or right thereof, which passed to the state of ·Wisconsin, under the act of Congress of August 8th, 1846, and subsequent action of said state and the governor thereof, hereinbefore recited, was conveyed to said plaintiffs, as trustees by the Fox and Wisconsin Improvement Company, under and in pursuance of an act of the legislature of the state, passed in October, 1856, entitled "An act to secure the en-

largement and completion of the improvement of the navigation of the Fox and Wisconsin rivers, &c.," which conveyance was made by deed of trust, dated December 1st, 1856, and that the plaintiffs, as such trustees, in virtue of the deed of trust, are now the lawful holders and owners of all the right, title, interest, possession, or right of possession which the state of Wisconsin, or the Fox and Wisconsin Improvement Company ever had, or now have in the tract. The defendants were in possession of the premises in question at the time of the commencement of this action, and now hold possession thereof, in virtue of the purchase by defendant Martin, and the conveyance from the Secretary of War.

There has never been any recognition on the part of the government of the United States, of any particular selection by the state of Wisconsin, of the tract in controversy, in this action, but that the war department, and the Secretary of the Interior of the United States, have refused to recognize the right of the state of Wisconsin, and the right of the plaintiffs as trustees to the lot.

These were all the facts submitted to the court and jury, and the counsel for the plaintiffs asked the court to instruct the jury as follows:   " 1. That the act of Congress, approved August 8th, 1846, entitled 'An act to grant a quantity of land to aid in the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal in the territory of Wisconsin,' constituted a grant *in presenti*, and was a release, transfer and conveyance of all its right, title, and interest in, and to an undivided half of all the lands belonging to the United States, lying within the limits of the grant, subject only to an acceptance thereof, by the then Territory of Wisconsin, when it should become a state.

" 2.   That the formal acceptance by the state, by act of the legislature, approved June 29, 1848, vested in the State of Wisconsin, the absolute fee of one half, undivided, of all the lands within the limits of the grant, to which the United States had title at the time of such acceptance.

" 3.   That the election by the governor of said state, to take the odd numbered sections, was an act of partition, and vested in the state, the title to all the odd numbered sections within the limits of the grant, unsold by the United States, at the time of the acceptance of said grant by the state aforesaid.

All of which the court gave to the jury, in terms as asked,

subject, however, to the following further instructions: "But the conveyance of the lands in question in this action does not come within these rules, because they were reserved by the United States, at the time of the passage of the act of the 8th of August, 1846, for military purposes."

And the counsel for the plaintiffs also asked the court to charge the jury as follows, which was refused:

4.   That the act of Congress, approved August 8th, 1846, aforesaid, is a special act, in the nature of a special contract, between the United States and the state, which was consummated when the state accepted said grant.   That said act is not effected in its operation by the general laws of the United States, with regard to the pre-emption and sale of public lands.

5.   That if the United States owned the premises in question at the time of the acceptance of the grant of the 8th of August, 1846, by the state, the fee of the United States therein passed to the state, by virtue of such grant and acceptance, and the election by the governor, to take the odd sections within the limits of the grant, provided said premises comprise any part of an odd numbered section, lying within the lateral limits of the grant, notwithstanding the reservation and occupation thereof by the United States, for military purposes.

6.   That the Secretary of War could convey no title to the premises in question, by virtue of the sale under which the defendants claim title, the title of the United States having been divested by the grant of the 8th of August, 1846, and the acceptance thereof by the state.

7.   That under the facts stipulated between the parties, the plaintiffs are entitled to a judgment, and the possession of the lands in controversy.

The jury, under the direction of the court, found a verdict for the defendant, upon which judgment was rendered; and the plaintiffs sued out this writ of error.

*Butler, Buttrick & Cotterill*, for the plaintiffs in error.

The question involved in this case is this: Did the act of the 8th of August, 1846, the acceptance by the state of the grant, the selection of the odd sections by the Governor, and the concurrence of the Commissioner of the Land Office in such selection, pass to the state the title to the odd sections within the limits of the grant which belonged to the United

States at the time, but which had been reserved for military purposes prior thereto, and which, at the time of the act aforesaid, were in the actual possession of the United States, under such reservation ?   If so, then the plaintiffs in this action must recover.   It is plain on original principles, and firmly settled by the highest judicial authority, that a legislative grant by Congress, does of itself, *propria vigore,* pass to the grantee all the estate which the United States had in the subject matter of the grant, except what is expressly excepted, and to this point see : *U. S. vs. Percheman,* 7 Pet., 51; *Mitchell vs. U. S.,* 9 id., 711; *U. S. vs. Brooks,* 10 How., 442; *Lessieur vs. Price,* 12 id., 57; *Ladigo vs. Roland,* 2 id., 581; *Godfrey vs. Bradley,* 2 McLean, 412.

The act of the 8th August, 1846, was a grant *in presenti,* and therefore passed the title of the United States, when the condition attached to the grant was complied with.   See opinion of Attorney General Cushing, in the Portage City case, 8th, Opinions of Attorney General U. S., 256 ; *Veeder vs. Guppy,* 3 Wis., 502; *Campbell vs. Doe,* 13 How., 244.

An act of Congress confirming a title, makes a legal title without a patent.   *Grignon's Lessee vs. Astor,* 2 How., 319; *Chouteau vs. Eckhart,* id., 344.

The grant and the acceptance were a compact, and took effect when the state accepted the grant.   *Rutherford vs. Green's Heirs,* 2 Wheat., 196; *Terrett vs. Taylor,* 9 Cranch, 43; *Fletcher vs. Peck,* 6 id., 87.

It is stipulated that the selection by the Governor of the odd sections, embraced all of the odd sections within the limits of the grant, which had not been disposed of prior to its passage, and which were not excepted by the grant itself, and that the tract in question is an odd section, within the limits of the grant, and that it belonged to the United States at the time of the passage of said act.

Now there is no exception in the grant itself, and if the tract in question does not come within the provisions of the grant and thereby pass to the state, it must be either because there is some constitutional provision which puts it out of the power of Congress to convey lands belonging to the United States, reserved for military purposes, or the terms of the grant must be construed in connection with some other act of Congress to which no reference is made, annulling in fact the plain and conclusive meaning of the granting act.   There is certainly no constitutional prohibition, and we think there is no

law of Congress which controls and governs the act in question. It has none of the provisions applicable to pre-emption rights, or which govern and control the sale of public lands of the United States under a general law.

There is no reason why a military reservation should be more sacred than an Indian reservation. The land in dispute in the case of *Veeder vs. Guppy*, were part of an Indian reservation to which the Indian title was not extinguished, and which was unsurveyed at the time of the grant, and yet the title to this land, and to *all* of the odd sections in the reservation within the limits of the grant, passed to the state by virtue of the granting act, and the title became absolute as soon as the land was surveyed.

In the case of *Cooper vs. Roberts*, 18 How., 173, ejectment was brought by the plaintiff to recover possession of part of sec. 16, T. 50, R. 39 W., in the mining region of Lake Superior in the state of Michigan. The plaintiff claimed it under a conveyance from the state, the defendant under a conveyance from the United States. The state claimed the right to convey it as school land, under the act of June 23, 1836, 5 Stat. at Large, 59, 60, granting school lands to Michigan. The land in question was surveyed in 1847. It was leased in 1845 by the Secretary of War, to the Minnesota Mining Company. The plaintiff acquired title from the state in 1851. The defendant from the United States in 1852. It was held that the legal title vested in the state of Michigan to the land, as soon as it was surveyed. Ordinance of 1787; Act of Congress, March 20, 1804; id., March 4, 1807; id., March 3, 1843; id., Sept. 4, 1841; id., August 8, 1846.

Now, if the proposition upon which the defense must rely to defeat this action, to wit., that the act of August 8th, 1846, cannot be construed to embrace the reservation in question, though the act does not in terms except it, is true, why will not the same principle apply to the pre-emption laws above cited, and to all the other acts of Congress in regard to the sale of public lands? And where was the necessity of excepting in these laws, lands intended to be reserved, if they were reserved from their operation without any such exception?

. The only authority which seems to sustain the position of the defendant, is the case of *Wilcox vs. Jackson*, 13 Peters, 498, in which the court says: " Whenever a tract of land has been appropriated to the public use, it is severed from the mass of the public domain, and no subsequent law, or proc-

lamation or sale would be construed to embrace it or to ope-
rate upon it, although no reservation were made of it." But
this is a mere dictum of the court not sustained by the facts
of the case, and if construed according to its language, the
mere legal appropriation of any particular tract of land, would
take away the power of Congress by "law," or the President
by "proclamation," or the register by "sale," to "*operate upon
it.*" Congress has always assumed the power to dispose of
the public domain, whether reserved or unreserved, and it is
absurd to assume that if Congress had the power to reserve
lands, that it could not afterwards annul the reservation and
pass a "law" which should operate upon and embrace the
lands reserved. In the case cited, it was sought to enter and
hold by pre-emption a tract of land which was not the sub-
ject of pre-emption by the very terms of the law under which
the land was sought to be entered. And this was the real
point of the case, and conclusive upon the right of the claim-
ant. The court however goes on to discuss the power of the
President of the United States to make reservations.

It may be contended in this case, that the plaintiffs have
shown no approval on the part of the President, of the selec-
tion of the odd sections by the Governor, but it is admitted
that the commissioner of public lands concurred in the selec-
tion, and in legal contemplation, this was the act of the Pres-
ident. *Wilcox vs. Jackson,* cited above. But Congress has
directly ratified the selection by the act of 3d March, 1849.

The department recognizes the position for which we con-
tend, and if this were a question between the plaintiffs and
the United States, the United States would release all claim to
the property in question. Opinion of Attorney General Black
in *Stockbridge Case.*

*Emmons, Van Dyke & Hamilton,* for the defendant in
error.

The act of Congress making this grant, and the action un-
der it with reference to the lands in dispute, conclude the
plaintiffs as to any claim of title. Sec. 1 of the act provides
that the lands are "to be selected under the direction of the
Governor of the state, and such selections to be approved by
the President of the United States."

It appears that in 1848, Governor Dewey made a general
selection of the odd numbered sections, and that subsequent-
ly, in 1857, a special selection was made of the Fort Winne-

bago property.   It further appears " that there had never been
any recognition on the part of the government of the United
States, of any particular selection by the state of Wisconsin of
the tract in controversy ; but that the war department and the
Secretary of the Interior have refused to recognize the right
of the state of Wisconsin, and the right of the plaintiffs," to
the premises in question.

The approval of the President was necessary to vest title in
the state to any particular selection.   This must be conceded,
or the language of the act rendered meaningless and oblitera-
ted.   That it required such approval, is over and again ad-
mitted and declared by the court in *Veeder vs. Guppy*, 3 Wis.,
520, and by Attorney General Cushing in *Portage City Case*,
to 533 ; 8th Opinions Attorney General.

The selections and approvals were, as is said by Mr. Justice
Smith, and Mr. Attorney General Cushing, acts of partition,
to determine what tracts the title to which should remain in
the general government, and what in the state.   The Presi-
dent, in pursuance of the rights reserved in the act of Con-
gress, has, through the proper departments, declared that the
title to this Fort Winnebago tract should remain in the Gov-
ernment.   Thus has the act of partition been performed ; and
no matter whether this tract was or was not affected by, or
included in the grant, it has become excluded and reserved
by the refusal of the President to approve the selection.   The
act of the war department and the Secretary of the Interior,
was his act.   The President speaks and acts through the
heads of the several departments in relation to subjects which
appertain to their respective duties.   *Wilcox vs. Jackson*, 3
Pet., 513.


*By the Court*, PAINE, J.   On the 8th day of August, 1846,
Congress passed an act granting to the state of Wisconsin on
her admission into the Union, a quantity of land equal to one
half of three sections in width on each side of the Fox river,
reserving the alternate sections to the United States, for the
purpose of aiding in the improvement of the navigation of the
Fox and Wisconsin rivers.   The lands were to be selected
under the directions of the Governor of the state, which selec-
tions were to be approved by the President.   The state ac-

cepted the grant, and the Governor selected the odd sections, which selection the President approved. Section No. 33, in township No. 13, north of range No. 9 east, was within the three sections in width from the Fox river, but in 1835 the President had, by authority of law, duly reserved it for military purposes; and at the time of the grant to this state, and the selection of the odd sections by the Governor, it was occupied by the United States as a military reservation, known as Fort Winnebago. It was subseqently abandoned as a military reservation, and sold by the Secretary of War, under the act of March 3, 1819, authorizing the sale of such military sites as had become useless for military purposes. At this sale the defendants became the purchasers of the lots in controversy in this suit, which are a part of that section. This sale took place in 1854. In 1857 the Governor made a special selection of this section under the grant, which selection the President has never approved.

The plaintiffs, as trustees of the Fox and Wisconsin River Improvement Company, which was entitled to all the rights which the state acquired under the grant, brought this action of ejectment to recover possession of the premises. The sole question in the case is, whether this section passed to the state by virtue of the grant, the selection of the odd sections by the Governor, and the approval of the selection by the President? The subsequent special selection never having been approved, can have no effect in its determination.

The title to this section was in the United States at the time of the grant, it was within the general limits of the grant, and it was within the letter of the selection and approval of the odd sections. It undoubtedly passed to the state, unless the fact that it was at the time, a military reservation, occupied as such by the United States, prevented that effect. And we think it did.

The counsel for the plaintiffs conceded that the object to

be aimed at in construing this act of Congress, as in all others, was the intent of Congress. And this being conceded, there seems to be no room for doubt, that Congress did not intend under the general terms of this law, to divest the United States of title to those specific portions within the limits of the grant, which had been previously set apart for public use, and were in actual occupation by the government for military purposes. On a bare statement of the facts, every mind perceives at once that this section might be brought within the letter of the grant by selection and approval, yet sees with equal clearness, that it was obviously outside of its spirit and intention. This conclusion seems irresistible from a moment's consideration of the general policy pursued by the government of the United States in disposing of its lands, and the difference between the purposes for which it holds the general body of those lands, and those for which it holds such as it actually occupies for some public purpose. The original title to the vast body of wild lands lying in the new states and territories, subject to such rights as are recognized in the Indian tribes, is in the United States. In respect to these lands it has pursued a wise and liberal policy. It has caused them to be surveyed as the advancing tide of settlement required, has disposed of them at small cost to individuals, and has frequently granted large tracts to aid in various public improvements. This has been and is well understood to be the purpose for which the government holds these lands. And the phrase " public lands," has a well known signification, limited to these only.

But on the other hand the government of the United States has need of specific portions of land in various parts of the country, usually small tracts, for military or other purposes, necessary for the actual transaction of the business of the government. It has provided by law for the reservation of such tracts. They are known as " reservations," and

there is a significance in the word. Reserved from what? Obviously reserved from disposition in the manner and for the purposes for which the general body of the public lands are disposed of. The very necessities of the government with respect to these reservations, take them out of the main body of public lands, and of the policy applicable thereto.

When the government therefore, obviously in pursuance of its general policy in respect to its public lands held for sale, makes a grant to the state of large quantities, reaching through an extensive tract of country, where it has large bodies of those lands, it is impossible to believe they intended to grant those tracts which had been set apart for public use. On the contrary such a grant can be reasonably construed as referring only to those lands within the policy which induced it. And it must be assumed that these reservations were not specifically excepted in the grant, for the reason that they were so obviously outside of its scope and intent, that such exception was not supposed to be necessary. And this view is sustained by the only authorities that have ever passed upon the question. In *Wilcox vs. Jackson*, 13 Peters, 498, the Supreme Court of the United States used the following language : " We go further and say that whenever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands, *and that no subsequent law or proclamation, or sale would be construed to embrace it, or to operate upon it, although no reservation were made of it.*"

Counsel suggested that this question was not in that case, and it was not necessary for the court to pass upon it. But whether necessary or not, we consider their rule of construction just and reasonable, and for that reason adopt it.

The case of the *State vs. Delesdenier*, 7 Texas, 76, is also an authority to the same effect. The islands had there been

reserved from sale, by law.   Subsequently there was further legislation in respect to the public lands, and with a repealing clause as follows : " And all laws heretofore enacted on the subject of public lands shall be and they are hereby repealed." A party having scrip which purported to authorize him to locate it on any of the public lands, located it on an island and obtained a patent.   The court conceded the law reserving the islands to be within the language of the repealing clause, but held that it was not the intent to repeal it, and that this clause was to be limited by the general scope and object of the subsequent  legislation  where it was found, which obviously did not extend to a change of the public policy, with respect to the islands.   And they adopt the language of the Supreme Court of the United States above. quoted.

It was claimed on the argument that there is no reason for a distinction between a military reservation, and an Indian reservation.   And the remarks of this `court in the case of: *Veeder vs. Guppy*, 3 Wis., 502, where it is assumed that Indian reservations passed by the grant, were relied on.   The opinion of the Attorney General of the United States to the same effect was also cited.   But if that doctrine is to be sustained, we apprehend it can only be upon the idea that the right of occupancy by the Indians is regarded as merely of a temporary character, and that the government itself by the policy which it has pursued towards that disappearing race, has been in the habit of removing them from place to place, and extinguishing their right of occupation, to make room for the advance of civilization.   Such having been its practice, there may be ground for saying that Congress intended to grant those lands, and proceed to extinguish the Indian right so as to give it full effect.   And it is only upon this view that their right is of a temporary character merely, that the assumption can be maintained at all.   For if it was

Spaulding et al. vs. Martin et al.

otherwise, if Congress had granted them rights of a permanent character, it is difficult to see how those rights could be defeated by a subsequent grant to others, unless they too are to be placed in that category of human beings having no rights which white men or governments are bound to respect.

Conceding therefore that it may be successfully maintained, that the Indian right in their reservations is not of such a character, as to exclude the idea that Congress intended to convey those reservations by the grant, we do not think it would at all follow that the same could be said as to reservations for the very purposes of the government itself. The purposes for which it holds these, utterly excludes the idea of an intention to grant them by general words; and its practice in respect to them has never been such as furnishes any support for a contrary position. And the understanding of all the parties concerned, the officers of this state as well as others, was in accordance with this view. No claim was set up under the grant and selection, to this section, so long as it was occupied by the government as a military post; and the parties who became subsequently desirous of including it, seemed to suppose that neither the governor in originally selecting the odd sections, nor the President in approving that selection, had reference to or intended to include this. Because after it was abandoned as a military reserve, the governor, probably at the request of parties more particularly interested, made a special selection of this section, which was never approved, and which was entirely unnecessary if the construction contended for by the plaintiffs, is correct.

We are of the opinion therefore that the selection, of which the tract in question was a part, did not pass to the state, but remained in the United States, subject to be disposed of by that government as it should see fit, in case it no longer desired to hold it for public use.

The judgment must be affirmed with costs.